## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**FEDERAL NATIONAL MORTGAGE ASSOCIATION**

**VERSUS**

**CEBARN CARROLL, ET AL.**

**CIVIL ACTION**

**NO. 21-551-RLB**

## ORDER

Before the Court is Defendants' Motion to Dismiss. (R. Doc. 12). The motion is opposed. (R. Doc. 13). Defendants filed a Reply. (R. Doc. 14).

The Court held oral argument on March 16, 2022. (R. Doc. 17).

**I.    Background**

On September 23, 2021, the plaintiff, Federal National Mortgage Association (FNMA) D/B/A Fannie Mae ("Fannie Mae"), acting by and through an endorsement from Arbor Commercial Funding I, LLC ("Arbor"), brought this action against the defendants, Cebarn Carroll and Austin Carroll (collectively, the "Defendants" or "Guarantors"). (R. Doc. 1, "Complaint"). There is no dispute that the Court can properly exercise diversity jurisdiction under 28 U.S.C. § 1332 because Fannie Mae is a citizen of the District of Columbia, the Defendants are respectively citizens of Florida and Washington, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

The underlying Loan Documents were all executed on September 7, 2016. Arbor, the predecessor-in-interest to Fannie Mae, loaned $8,000,000.00 (the "Loan") to Carroll Properties One LLC ("Carroll Properties" or "Borrower") pursuant to the terms of a Multifamily Loan and Security Agreement (Non-Recourse) (the "Loan Agreement"). (R. Doc. 1-1 at 1-124; Ex. 1 to Complaint). Carroll Properties executed a Multifamily Note promising to pay the Loan ("Note").

(R. Doc. 1-1 at 125-130; Ex. 2 to Complaint). Defendants executed a Guaranty of Non-Recourse Obligations ("Guaranty"). (R. Doc. 1-1 at 131-143; Ex. 3 to Complaint). Carroll Properties executed a Multifamily Mortgage, Assignment of Leases and Rents and Security Agreement ("Security Agreement"), which grants a security interest to certain real property and improvements in Baton Rouge known as the Pine Grove Apartments (the "Property"). (R. Doc. 1-1 at 144-165; Ex. 4 to Complaint). Arbor assigned the Security Agreement to Fannie Mae. (R. Doc. 1-1 at 166-168; Ex. 5 to Complaint). Arbor also endorsed the original Note and assigned the Loan Agreement, Guaranty, and other Loan Documents to Fannie Mae. (R. Doc. 1-1 at 169-171; Ex. 6 to Complaint).

On September 12, 2018, Arbor, on behalf of Fannie Mae, sent a letter putting Carroll Properties on notice that it was allegedly in violation of the Loan Agreement in light of certain property maintenance deficiencies identified in a Property Condition Assessment[1] ("Notice of Demand for Cure"). (R. Doc. 1-1 at 172-175, Ex. 7 to Complaint). Arbor demanded that Carroll Properties deposit with Arbor $890,875.00 within thirty days, and that Carroll Properties immediately increase the amount of its monthly Replacement Reserve deposits to $2,926.58 per month, reserving all of Fannie Mae's other rights under the Loan Agreement. (R. Doc. 1-1 at 173-174).

On October 26, 2018, Fannie Mae sent a letter putting Carroll Properties on notice that there was an "Event of Default" under Section 14.01 of the Loan Agreement because Carroll Properties did not timely deposit the sums demanded by Arbor ("Notice of Default"). (R. Doc. 1-1 at 176-179, Ex. 8 to Complaint). Fannie Mae notified Carroll Properties that the loan was accelerated, that Fannie Mae had the right to foreclose on the Property, and that Fannie Mae had

---

[1] The Property Condition Assessment is detailed in Section 6.03 of the Loan Agreement.

terminated Carroll Properties' license to collect rents. (R. Doc. 1-1 at 176-179). Consistent with the foregoing, Fannie Mae now alleges that a "default occurred under the Note when Carroll Properties failed to maintain the Property in good repair and condition, as required under the loan documents, particularly Article 6 of the Loan Agreement."[2] (Complaint ¶¶ 12-13).

On December 28, 2018, Fannie Mae filed a Verified Petition for Executory Process in the 19th Judicial District for the Parish of East Baton Rouge, State of Louisiana, in light of alleged violations of Article 6 and the resulting Event of Default under Section 14.01 (the "Executory Proceeding").[3] (R. Doc. 1-1 at 180-191; Ex. 9 to Complaint). Fannie Mae alleges that at the time of the filing of the Executory Proceeding, the total balance of the Loan was $8,153,223.84 (including attorney's fees to date). (Complaint ¶ 21).

On January 24, 2019, the State Court judge signed an Order of Seizure and Sale in the Executory Proceeding, ordering the issuance of Writ of Seizure and Sale, with appraisal, of the Property. (R. Doc. 1-1 at 192-194). The Order of Seizure and Sale appointed Latter & Blum Property Management, Inc. ("Latter & Blum") as the keeper of the mortgaged property with full power of administration of the seized property. (R. Doc 1-1 at 194).

On September 23, 2020, Fannie Mae purchased the Property at the judicial sale for $2,500,000.00, and paid $107,824.74 in commissions, fees, and costs. (R. Doc. 1-1 at 195-202; Ex. 11 to Complaint). Fannie Mae now alleges the total amount due on the Loan at the time of the judicial sale was $9,900,885.85. (Complaint ¶¶ 23-24). Fannie Mae further alleges that the

---

[2] The Loan Agreement contains top-level "Articles" that are further broken down into "Sections." For example, Article 6 of the Loan Agreement ("Property Use, Preservation, and Maintenance") is further broken down into Section 6.01 ("Representations and Warranties"), Section 6.02 ("Covenants"), and Section 6.03 ("Mortgage Loan Administration Regarding the Property"). This Order follows the naming conventions in the Loan Agreement by referencing Articles and Sections.

[3] *See Federal National Mortgage Association (FNMA) d/b/a Fannie Mae v. Carroll Properties One LLC*, No. 677793, Div. "D".

Property was appraised by the Sheriff of East Baton Rouge Parish for $3,500.000.00. (Complaint ¶ 25); (*See* R. Doc. 1-1 at 203; Ex. 12 to Complaint).

In the instant action, Fannie Mae first raises a Claim for Deficiency, which seeks recovery of $8,040,057.21, under the Louisiana Deficiency Judgment Act ("LDJA"), La. R.S. 13:4106 *et seq.* (Complaint ¶¶ 26-37). Fannie Mae alleges that Defendants are personally liable for the entire deficiency amount in light of the breach of the Loan Documents, particularly for violation of Section 3.02(b)(2) of the Loan Agreement, which provides for full personal liability for the Loan where there is a "Transfer" that is not permitted under the Loan Agreement. (Complaint ¶¶ 32-33). There is no dispute that three separate liens were placed on the Property prior to the September 23, 2020 judicial sale: (1) $7,477.54 lien by Cornerstone Commercial Flooring, L.L.C recorded on November 19, 2018 (the "Cornerstone Lien"); (2) $17,009.68 lien by Noland Company recorded on February 1, 2019 (the "Noland Lien"); and (3) a $12,382.50 lien by Baton Rouge Sewer & Drain Service, Inc. d/b/a Roto Rooter Plumbing recorded on February 6, 2019 (the "Roto Rooter Lien") (collectively, the "Liens"). (R. Doc. 1-1 at 199-200).[4] Fannie Mae alleges that these three Liens were disallowed "Transfers" under Section 11.02 and Schedule 1 to the Loan Agreement, which results in the Guarantors being personally liable to Fannie Mae for the deficiency amount under Section 3.02(b)(2) of the Loan Agreement and the LDJA. (Complaint ¶¶ 32-37).

Fannie Mae also raises a Claim for Waste, which alternatively alleges that the Guarantors are personally liable for breach of their obligations to repair and maintain the Property under Louisiana Revised Statute 9:5382. (Complaint ¶¶ 38-44). Fannie Mae alleges that the Property was originally appraised at $10,000,000.00 when the Loan Agreement was executed, and the

---

[4] Only the Cornerstone Lien, however, was recorded prior to the commencement of the Executory Proceeding and Order of Sale and Seizure.

failure to maintain the Property resulted in a diminished valuation at the judicial sale of $3,500,000.00. (Complaint ¶¶ 41-44).[5]

Finally, Fannie Mae is also seeking recovery of attorney's fees under Paragraph 3(b) of the Guaranty. (Complaint ¶¶ 45-46).

On November 18, 2021, Defendants filed the Motion to Dismiss, which seeks dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (R. Doc. 12). Defendants claim that they, as Guarantors, have no personal liability because the Executory Proceeding was based on a non-recourse ground under Article 6 of the Loan Agreement, which limited recovery to an exercise of rights and remedies to the Property and other collateral under Section 3.01. Defendants assert that Fannie Mae cannot now raise a claim for personal liability under Section 3.02 based upon the allegedly disallowed "Transfers" based on the Liens.

Through contract-based arguments, Defendants argue that under the Loan Agreement, Fannie Mae was obligated to provide notice of an Event of Default (and an opportunity to cure) with respect to any disallowed "Transfers" based on the Liens in light of the language of Section 11.02(a) of the Loan Agreement. Given that Fannie Mae did not otherwise allege or amend their Petition in the Executory Proceeding to raise the issue of alleged disallowed "Transfers" (and the potential for personal liability), Defendants argue that the Court should apply the doctrines of *res judicata* and judicial estoppel to preclude the instant action, which seeks full personal liability for the deficiency amount.

---

[5] In the Complaint, Fannie Mae does not expressly mention Section 3.02(a)(6), which provides that the "Borrower shall be personally liable to Lender for the repayment of the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, subject to any notice and cure period, if any . . . waste or abandonment of the Mortgage Property." (R. Doc. 1-1 at 17). Fannie Mae asserts in its Opposition, however, that its Claim for Waste is grounded on Section 3.02(a)(6). (R. Doc. 13 at 9). Defendants do not address this assertion in their Reply. Accordingly, and in addition to the reasons set forth below regarding *res judicata* and judicial estoppel, the Court finds no basis for concluding that Fannie Mae's Claim for Waste is subject to dismissal based on the instant Motion to Dismiss.

## II.     Law and Analysis

### A.     Legal Standards for Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a Rule 12(b)(6) motion, a pleading's language, on its face, must demonstrate that there exists plausibility for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In determining whether it is plausible that a pleader is entitled to relief, a court does not assume the truth of conclusory statements, but rather looks for facts which support the elements of the pleader's claim. *Twombly*, 550 U.S. at 557. Factual assertions are presumed to be true, but "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" alone are not enough to withstand a 12(b)(6) motion. *Iqbal*, 556 U.S. at 678.

In most circumstances, a court should allow a plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (plaintiffs are generally given one chance to amend before dismissal unless "it is clear that the defects are incurable"). However, a court should deny leave to submit futile amendments that are "insufficient to state a claim." *Jamieson v Shaw*, 772 F.2d 1205, 1209 (5th Cir. 1985).

B.      **Defendants' Arguments under the Loan Agreement**

1.      **Applicable Law on Contract Interpretation**

The Court applies substantive state law in a diversity action. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *see ACS Construction Co., Inc. of Mississippi v. CGU*, 332 F.3d 885, 888 (5th Cir. 2003) ("We look to state law for rules governing contract interpretation."). In addition, Section 15.01(a) of the Loan Agreement provides that the Loan Agreement "shall be governed by the laws of the Property Jurisdiction without regarding to the application of choice of law principles." (R. Doc. 1-1 at 85). Similarly, Paragraph 19 of the Guarantee provides that it shall be governed by and construed in accordance with the substantive law of the Property Jurisdiction without regarding to application of choice of law principles . . . ." (R. Doc. 1-1 at 138). The Property Jurisdiction is the State of Louisiana. (R. Doc 1-1 at 105, 150). Accordingly, the Court will interpret the Loan Agreement and Guarantee in accordance with Louisiana law.

"Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code art. 2048.

"A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049. "Each provision in a contract must be interpreted in light of the other provisions so that each is given

the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. "A doubtful

provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of

the parties before and after the formation of the contract, and of other contracts of a like nature

between the same parties." La. Civ. Code art. 2053. "Equity, as intended in the preceding

articles, is based on the principles that no one is allowed to take unfair advantage of another and

that no one is allowed to enrich himself unjustly at the expense of another. Usage, as intended in

the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to

the object of a contract subject to interpretation." La. Civ. Code art. 2055.

Section 15.08(a) of the Loan Agreement specifically provides that "[t]he captions and

headings of the sections of this Loan Agreement and the Loan Documents are for convenience

only and shall be disregarded in construing this Loan Agreement and Loan Documents." (R.

Doc. 1-1 at 88).

"The determination of whether a contract is clear or ambiguous is a question of law.

Moreover, when a contract can be construed from the four corners of the instrument without

looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of

law . . ." *Angus Chem. Co. v. Glendora Plantation, Inc.*, 782 F.3d 175, 180 (La. 2015) (quoting

*Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007)). "The Court may

consider extrinsic evidence as to the parties' intent only if the contract is ambiguous." *Thorne v.

Bard Peripheral Vascular, Inc.*, No. 16-0262, 2016 WL 3746148, at *4 (E.D. La. July 13, 2016)

(citing *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002)).

### 2.    Analysis of Defendants' Contract-Based Arguments

Defendants' contract-based arguments concern whether the recordation of the three Liens

constitute disallowed "Transfers" under the Loan Agreements. In support of this position,

Defendants reference Section 11.02(a)(2) of the Loan Agreement, which provides a 60-day period after actual notice or constructive notice of the existence of a lien. Defendants argue that the "specific rights and remedies of the parties with respect to liens are set forth in Section 11.02" of the Loan Agreement, and, therefore, Fannie Mae cannot seek to impose personal liability with respect to a disallowed "Transfer" under Section 3.02(b) of the Loan Agreement.

As an initial matter, there is no dispute that Paragraph 3 of the Guarantee provides that Defendants, as Guarantors, may be held personally liable for "all amounts, obligations and liabilities owed to [Fannie Mae] under Article 3 (Personal Liability) of the Loan Agreement . . . ." (R. Doc. 1-1 at 132). Accordingly, the Court will turn to the applicable language of the Loan Agreement to determine whether Defendants, as Guarantors, may be held personally liable, given the allegations in the Complaint, under Section 3.02(b) of the Loan Agreement.

Article 3 of the Loan Agreement is titled "Personal Liability." (R. Doc. 1-1 at 16-19). Section 3.01 provides that the Borrower shall not have personal liability under the Loan Agreement unless otherwise provided in Article 3 or any other Loan Document. (R. Doc. 1-1 at 16). Section 3.02(b) provides for full personal liability for a loan deficiency.[6] As discussed above, the parties dispute whether the three Liens constitute disallowed "Transfers" that would result in personal liability of the Defendants. Section 3.02(b)(2) specifically provides for personal liability "for the repayment of all of the Indebtedness . . . upon the occurrence of . . . a Transfer . . . that that is not permitted under this Loan Agreement or any other Loan Document." (R. Doc. 1-1 at 18). In turn, Schedule 1 to the Loan Agreement defines a "Transfer" as, among other things, "a granting, pledging, creating or attachment of a lien, encumbrance or security

---

[6] As discussed above, the parties do not address the implications of Section 3.02(a)(6), which provides for personal liability "for the repayment of the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, subject to any notice and cure period, if any . . . waste or abandonment of the Mortgaged Properties." (R. Doc. 1-1 at 17). Defendants focus solely on addressing full recourse liability in Section 3.02(b).

interest (whether voluntary, involuntary, or by operation of law)." (R. Doc. 1-1 at 108). According to Fannie Mae, the attachment of the Liens constituted "Transfers" as defined by Schedule 1 of the Loan Agreement, and those "Transfers" were not authorized under Section 11.02 of the Loan Agreement.

Defendants argue that rather than consider the "general" definition of "Transfer" in Schedule 1 of the Loan Agreement, the Court must focus on the "specific rights and remedies of the parties with respect to liens as set forth in Section 11.02" of the Loan Agreement. (R. Doc. 12-1 at 8). In support of this argument, Defendants assert that finding otherwise "is directly contrary to a fundamental principle of contract interpretation that specific terms of an agreement control over its general terms." (R. Doc. 12-1 at 8) (citing *Corbello v. Iowa Production*, 850 So.2d 686, 704 (La. 2003)). But applying the specific definition of "Transfer" agreed upon in Schedule 1 of the Loan Agreement is not contrary to the foregoing principle. The Court is mindful that each provision in the Loan Agreement must be interpreted in light of the other provisions in the Loan Agreement "so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. Accordingly, the Court will look to both the definition of "Transfer" in Schedule 1 of the Loan Agreement and the application of that term in Section 11.02 to determine whether the attachment of the Liens constituted disallowed "Transfers" under the Loan Agreement.

Article 11 of the Loan Agreement is titled "Liens, Transfers, and Assumptions." (R. Doc. 1-1 at 54-64). Section 11.02(b)(1)(F) expressly provides that a "Borrower shall not Transfer, or cause or permit a Transfer of, all or any part of the Mortgaged Property (including any interest in the Mortgaged Property) other than . . . a lien permitted pursuant to Section 11.02(a) of the Loan

10

Agreement." (R. Doc. 1-1 at 55-56).[7] A "Transfer" (including the attachment of a lien) is not allowed under the Loan Agreement unless specifically permitted pursuant to Section 11.02(a), which again provides that the grant or creation of a lien is generally not allowed unless certain conditions are met. Section 11.02(a)(2)(A) provides a narrow carve-out for "the creation of . . . any tax lien, municipal lien, utility lien, mechanics' lien, materialmen's lien against the Mortgage Property if bonded off, released of record, or otherwise remedied to Lender's satisfaction within sixty (60) days after the earlier of the date Borrower had actual notice or constructive notice of the existence of such lien." (R. Doc. 1-1 at 55). In other words, if one of the three events listed in Section 11.02(a)(2)(A) is satisfied within 60 days of actual or constructive notice, then the lien at issue is not a disallowed "Transfer" under Section 11.02(b)(1)(F).

In light of the foregoing 60-day period provided in Section 11.02(a)(2)(A), Defendants argue that Fannie Mae could not have asserted a valid claim against Carroll Properties with respect to the Noland Lien and the Roto Rooter Lien because these liens were placed on the Property after Latter & Blum was appointed as keeper and administrator on January 29, 2019. (R. Doc. 12-1 at 5). Defendants further argue that Fannie Mae did not provide Carroll Properties the opportunity to "cure" the Cornerstone Lien (or the other liens for that matter) because Fannie Mae did not put Carroll Properties on notice of its default before the Petition was filed on December 28, 2018 or any time up to the judicial sale of the Property on September 23, 2020. (R. Doc. 12-1 at 6-8).

---

[7] Fannie Mae only references Section 11.02 once in the Complaint, by solely asserting it prohibits the "Transfer, or cause or permit a Transfer of, all or any part of the Mortgaged Property[.]" (*See* Complaint ¶ 33). The Complaint makes no mention of the 60-day period found in Section 11.02(a)(2)(A).

In opposition, Fannie Mae asserts that it did not have a duty to provide notice of the occurrence of disallowed "Transfers" or to permit a cure period because all remedies for breaches of the Loan Agreement are located in Article 14. (R. Doc. 13 at 5-10). Fannie Mae assert that Section 11.02 does not contain any "specific rights and remedies" of the parties, including any specific cure periods for disallowed "Transfers." Fannie Mae highlights that Section 14.01(a)(6) includes disallowed "Transfers" (including the attachment of a lien, encumbrance, or security interest) within the listed Automatic Events of Default, noting further that such Automatic Events of Default are separate from breaches of the Loan Agreement that are subject to Specified Cure Periods under Section 14.01(b) or Extended Cure Periods under Section 14.01(c).

Fannie Mae further argues that Section 11.02(a) does not require it to provide written notice of the creation of a lien to begin the 60-day period, given that this period runs from the date that the Borrower has "constructive notice" of the lien. Fannie Mae argues that Carroll Properties had constructive knowledge of the Cornerstone Lien, which was recorded in the public records on November 19, 2018, and which remained on record for more than 60 days prior to Latter & Blum's keeper appointment on January 29, 2019, and, therefore, "cause[d] or permit[ed]" a "Transfer" prohibited by Section 11.02(b). Fannie Mae acknowledges that the Nolan Lien and Roto Rooter Liens were recorded after Latter & Blum's keeper appointment, but nevertheless argues that there is a question of fact regarding whether Carroll Properties' failure to pay sums due to these lienholders for work performed while under its ownership "cause[d] or permit[ted]" a disallowed "Transfer" under Section 11.02(b)(1)(F).

The Court interprets the Loan Agreement as written and in conformance with Louisiana's law on contract interpretation. Article 14 of the Loan Agreement is titled "Defaults/Remedies."

(R. Doc. 1-1 at 78-84). (R. Doc. 1-1 at 78-70). Section 14.01 recognizes three "Events of Default" in the Loan Agreement: (a) Automatic Events of Default; (b) Events of Default Subject to a Specified Cure Period; and (c) Events of Default Subject to Extended Cure Period. Section 14.01(a)(6) specifically provides that "the occurrence of any Transfer not permitted by the Loan Documents . . . shall constitute an automatic Event of Default." (R. Doc. 1-1 at 78). But whether the existence of the Liens constitute a "Transfer not permitted by the Loan Documents" must be resolved under Section 11.02. The 60-day period provided in Section 11.02(a)(2)(A) provides the Borrower with 60 days to ensure that the lien at issue is treated as a "lien permitted pursuant to Section 11.02(a)" and, accordingly, a "Transfer" that is allowed under Section 11.02(b)(1)(F). (R. Doc. 1-1 at 55-56). There can be no automatic "Event of Default" until <u>after</u> the 60-day period has run. Accordingly, the 60-day period is not a "cure period" after an Event of Default; it is instead a period to determine whether any such Automatic Event of Default has occurred under Section 14.01(a)(6).

Defendants acknowledge that Section 14.01(b) and 14.01(c) specify certain defaults that are subject to cure periods and extended cure periods, but nevertheless argue that these provisions must not be read in isolation, and that Section 11.02(a)(2)(A) provides a 60-day period to "remedy" the creation of certain liens on the Property. (R. Doc. 14 at 2-3). As discussed above, the Court interprets the 60-day period as a period of time leading up to a possible Automatic Event of Default under Section 14.01(a)(6), and not a specific cure period after such an Automatic Event of Default. Accordingly, there is no inconsistency between the cure periods provided by Section 14.01(b)-(c), and the 60-day period provided Section 11.02(a)(2)(A).

Defendants have not directed the Court to any language in the Loan Agreement providing that Fannie Mae had a duty to provide written notice of, or a cure period for, an Automatic Event of Default such as "the occurrence of any Transfer not permitted by the Loan Documents" under Section 14.01(a)(6). The Court cannot conclude, however, based on the pleadings and arguments of the parties, that any such disallowed "Transfers" occurred. Based on a plain reading of the Loan Agreement, whether there was a disallowed "Transfer" under Section 11.02(b)(1)(F) raises factual issues that survive a motion to dismiss. One factual issue is when Carroll Properties had actual or constructive notice of the Liens, which would trigger the 60-day period for determining whether the "Transfer" was allowed under the Loan Agreements.[8] Furthermore, there is a question regarding whether the Liens were "remedied to Lender's satisfaction." It is possible that the sale of the Property to Fannie Mae for $2.5 million remedied the Liens to Fannie Mae's satisfaction, as evidenced by Fannie Mae's failure to raise the issue of the Liens until one year after the sale of the Property in the instant deficiency action. The Court will not decide that issue, however, in the context of a Rule 12(b)(6) motion to dismiss.

Furthermore, Defendants have not directed the Court to any specific language in the Loan Agreement in support of the conclusion that the Nolan Lien or Roto Rooter Lien did not constitute "Transfers" not allowed by the Loan Agreement because they were recorded after the appointment of Latter & Blum as keeper and administrator of the Property. There also remains an issue as to whether Carroll Properties "cause[d] or permit[ted]" these "Transfers" under Section 11.02(b)(1)(F) in light of its failure to maintain the Property.

Defendants further argue that Carroll Properties was deprived of the opportunity to cure the Cornerstone Lien because Fannie Mae "had already taken over [Carroll Properties'] cash

---

[8] At oral argument, the parties appeared to agree that there was constructive notice of the liens based on their filing into the public record.

flow by terminating [Carroll Properties'] license to collect rents as of October 26, 2018." (R. Doc. 12-1 at 7; *see* R. Doc. 1-1 at 178). Defendants do not cite any language in the Loan Agreement, however, providing that the only way to satisfy a lien on the Property is through payments made with rents obtained on the Property.

For the foregoing reasons, the Court will not dismiss Fannie Mae's claims based on Defendants' contract-based arguments.

### C.    Whether *Res Judicata* Bars the Deficiency Claims

"As a matter of federal common law, federal courts sitting in diversity apply the preclusion law of the forum state unless it is incompatible with federal interests." *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). In determining whether a state court suit is precluded by *res judicata*, a Louisiana court would apply Louisiana Revised Statute 13:4231. The Louisiana *res judicata* statute provides, in pertinent part, that "[i]f the [valid and final] judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment." La. R.S. 13:4231(1). "The four prerequisites for the application of res judicata under La. R.S. 13:4231 are: (1) the parties must be identical in both suits, or in privity; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must be a final judgment on the merits; and (4) the same claim or cause of action must be involved in both cases." *Sosebee v. Steadfast Ins. Co.*, 701 F.3d 1012, 1026 (5th Cir. 2012).[9]

---

[9] For the purposes of addressing the issue of *res judicata*, the Court considers the Order of Seizure and Sale a "judgment." *See Countrywide Home Loans Servicing, LP v. Thomas*, 113 So. 3d 355, 258, *writ denied*, 118 So. 3d 397 (La. 2013); *but see Nationstar Mortg., LLC v. Harris*, 141 So. 3d 829, 834 (La. App. 4th Cir. 2014) ("[T]he true judgment in an executory proceeding is not the order of seizure and sale; rather, it is the debtor's confession of judgment in the mortgage.").

There does not appear to be any dispute that the first three requirements for *res judicata* have been satisfied. Having considered the arguments or the parties and the applicable law, however, the Court concludes that *res judicata* does not bar this deficiency action for at least two reasons.

First, a cause of action for deficiency could not be "merged in the judgment" in the Executory Proceeding because the deficiency itself did not come into existence until the September 23, 2020 judicial sale of the property. *See Tower Partners, L.L.C. v. Wade*, 869 So. 2d 126, 130 (La. 4th Cir. 2004), *writ denied*, 869 So. 2d 889 (La 2004) (rejecting the application of *res judicta* to bar foreclosing creditor's deficiency action because "the cause of action for a deficiency did *not* arise or exist until it was known that a deficiency actually existed, i.e., . . . when the sheriff issued his return on the writ of seizure and sale which demonstrated that the sale proceeds of the property are insufficient to satisfy [the foreclosing creditor's] claim."). Fannie Mae "could have filed its claim for a deficiency as a reconvention with the court's permission," as allowed by Louisiana Code of Civil Procedure Article 1066, or could have obtained "a deficiency judgment against the debtor by converting the executory proceeding into an ordinary proceeding as provided in Article 2664," as allowed by Louisiana Code of Civil Procedure Article 2772, but it was not required to do so. *Tower Partners*, 869 So. 2d at 130. Louisiana procedural law expressly provides that as an alternative to converting the executory proceeding into an ordinary proceeding, a "creditor may obtain a deficiency judgment . . . by a separate suit." La. C.C.P. art 2772. Accordingly, the fourth prerequisite for *res judicata* – that the same claim or cause of action must be involved in both actions – fails where a creditor, as Fannie Mae did here, chooses to file a separate deficiency judgment action. *See Tower Partners*, 869 So. 2d at 131.

Second, a statutory exception to the general rule of *res judicata* is applicable. Louisiana law provides that "a judgment does not bar another action by the plaintiff . . . when the judgment reserved the right of the plaintiff to bring another action." La. R.S. 13:4232(A)(3).[10] Paragraphs 8 and 9 of the Order of Seizure and Sale provides the following:

> 8.    Nothing herein shall prejudice . . . Fannie Mae's right to further exercise, in any order, any one or more of the remedies available to Fannie Mae under the Loan Documents or otherwise at law or in equity, including without limitation, the right to pursue Borrower and any other maker or guarantor of the indebtedness represented by the Note, Security Instrument, UCC Financing Statement or any other Loan Document remaining after completion of the Sheriff's sale(s) of the Property, and the net sales proceeds of the Sheriff's sales have been credited to the indebtedness represented by the Note, Security Instruction and any other Loan Document; and

> 9.    Nothing herein shall be construed to waive Fannie Mae's right to pursue a deficiency, if any, between the amount recovered by Fannie Mae from the sale of the Property and indebtedness due under the Loan Documents.

(R. Doc. 1-1 at 194). Accordingly, the Order of Seizure and Sale expressly reserves Fannie Mae's rights to bring the instant action for personal liability against the Defendants, as Guarantors.[11]

In reply, Defendants argue that Fannie Mae's argument that "res judicata does not apply because its cause of action for deficiency judgment did not exist at the time of the executory proceedings" is a "red herring." (R. Doc. 14 at 3). Defendants argue that "to have preserved its right to pursue a deficiency judgment action against the primary debtor [Carroll Properties] and Defendants, [Fannie Mae] was required to plead in its foreclosure suit a breach of a full-recourse ground under Section 3 of Non-Recourse Loan Agreement." (R. Doc. 14 at 9). In support of this

---

[10] Fannie Mae mistakenly cites Louisiana Revised Statute "13:3242" in its opposition. (*See* R. Doc. 13 at 13-14).
[11] Paragraph 4 of the Order of Seizure and Sale states that "Fannie Mae shall be and hereby is permitted to update the amount of indebtedness prior to the Sheriff sale by providing the Sheriff with an updated payoff amount." (R. Doc. 1-1 at 193). Defendants assert that this provided Fannie Mae the opportunity to raise their default claims based on disallowed "Transfers" in the Executory Proceeding. (*See* R. Doc. 12-1 at 4-5). Again, while Fannie Mae could have raised such claims, they were not compelled to do so.

17

proposition, Defendants rely primarily on *Countrywide Home Loans Servicing, LP v. Thomas*, 113 So. 3d 355 (La. App. 4 Cir. 2013), *writ denied*, 118 So. 3d 397 (La. 2013). The *Countrywide Home* decision merely provides that an untimely reconventional demand (i.e., counterclaim) for wrongful eviction brought by the mortgagor after an order of seizure was issued, and the property was sold, was barred by *res judicata*. The *Countrywide Home* decision did not concern a deficiency judgment or otherwise address the issues raised in *Tower Partners*, the express statutory language of La. C.C.P. Article 2772, La. C.C.P. Article 1066, La. R.S. 4232(A)(3), or any reservations of rights in the Order of Seizure and Sale. Indeed, Louisiana courts have held that a reconventional demand for damages, which employs ordinary proceedings, is not appropriately brought in an executory proceeding. *See Deutsche Bank Tr. Co. Am. v. Ochoa*, 120 So. 3d 735, 739 (La. App. 5th Cir. 2013) (citing La. C.C.P. art. 462).

Based on the pleadings before the Court, *res judicata* does not apply to bar the instant deficiency lawsuit.

### D.    Whether the Doctrine of Judicial Estoppel Bars the Deficiency Claims

In a diversity action, the application of federal law concerning judicial estoppel is appropriate to provide the federal court the ability to protective itself from manipulation as a matter of federal procedure. *Hall v. GE Plastic Pac. PTE Ltd*., 327 F.3d 391, 395-96 (5th Cir. 2003).

"The doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996) (citing *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993)). "The doctrine prevents internal inconsistency, precludes litigants from 'playing fast and loose' with the courts, and prohibits parties from

deliberately changing positions based upon the exigencies of the moment." *Id.* Judicial estoppel "is an equitable doctrine involved by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (citation omitted). "In assessing whether judicial estoppel should apply, [courts] look to see whether the following elements are present: (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011).

Here, Defendants argue that "a ruling of judicial estoppel is warranted based on the inconsistent positions taken by Fannie Mae in previous litigation that now form the basis for its deficiency claim." (R. Doc. 12-1 at 9). In short, Defendants argue that because Fannie Mae never asserted any basis for filing personal liability under Section 3.02(b) in the Executory Proceeding, and instead relied solely on a non-recourse basis for default under Article 6, it cannot now assert a personal liability clam against Defendants. In opposition, Fannie Mae argues that it has not taken opposite or contrary positions that would merit the application of the doctrine of judicial estoppel. (R. Doc. 13 at 14-18).

That Fannie Mae is now seeking personal liability in a deficiency action based on an alleged disallowed "Transfer" is not plainly inconsistent with the allegations in the Executory Proceeding. Based on the pleadings and the arguments of the parties, Fannie Mae is now only seeking to recover for personal liability based on <u>additional</u> bases for default that were not raised in the earlier Executory Proceeding.

In reply, Defendants argue that the Fifth Circuit's application of judicial estoppel in *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831 (5th Cir. 2000) supports a similar application of the doctrine in this case. In *Ahrens*, the plaintiff provided plainly inconsistent deposition testimony:

in the former action involving claims of tortious interference, the plaintiff stated her employment was terminated because of tortious interference; whereas in the latter action involving claims of employment discrimination, the plaintiff stated she was terminated because of her sex and disability. *Id*. at 833-834. While the Fifth Circuit acknowledged that the plaintiff was not required to prove that either tortious interference or discrimination was the sole cause of discharge in the respective actions, the plaintiff nevertheless gave "incomplete, inconsistent responses to broad, open-ended, *identical* questions simply because they did *not* ask for the *sole* reason for her discharge." *Id*. at 835 (emphasis in the original). Under these circumstances, the Court found that the first requirement for judicial estoppel—use of inconsistent positions—was satisfied. *Id*.

Unlike in *Ahrens*, Defendants do not cite any specific representations by Fannie Mae in the Executory Proceeding that are plainly inconsistent with the allegations raised in the instant deficiency action. For example, Defendants do not cite any testimony by Fannie Mae, or specific representations by its counsel, providing that the only basis for default under the Loan Agreement was the non-recourse default raised and litigated in the Executory Proceeding. Furthermore, the instant Complaint acknowledges the events that transpired leading to the filing of the Petition in the Executory Proceeding, the Order of Seizure and Sale, and the resulting judicial sale of the Property.

The Court will not apply the doctrine of judicial estoppel based on arguments raised in the instant Motion to Dismiss. To the extent Defendants discover specific plainly inconsistent positions by Fannie Mae, they may renew their arguments for judicial estoppel in an appropriate motion for summary judgment.

**III.    Conclusion**

Based on the foregoing,

**IT IS ORDERED** that Defendants' Motion to Dismiss (R. Doc. 12) is **DENIED**.

**IT IS FURTHER ORDERED** that, **on or before April 8, 2022**, the parties shall submit an **Amended Status Report** requesting new discovery deadlines to be set in this action. It shall be plaintiff's responsibility to consult with the defense, prepare and file the status report.

Signed in Baton Rouge, Louisiana, on March 22, 2022.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**