**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

FEDERAL NATIONAL MORTGAGE
ASSOCIATION (FNMA) D/B/A FANNIE
MAE

VERSUS

CEBARN CARROLL AND AUSTIN
CARROLL

CIVIL ACTION NO. 21-551

JUDGE: SHELLY D. DICK

MAGISTRATE JUDGE: RICHARD L.
BOURGEOIS, JR.

---

### THIRD PARTY COMPLAINT

NOW INTO COURT, through undersigned counsel, come defendants/third party plaintiffs Cebarn Carroll and Austin Carroll (referred to collectively as "Defendants") and, for its Third Party Complaint against Latter & Blum Property Management Inc. ("Latter & Blum"), aver as follows:

### PARTIES

**1.**

Plaintiff Federal National Mortgage Association d/b/a Fannie Mae ("Fannie Mae") is a government-sponsored enterprise chartered by Congress with its principal office in Washington, D.C., deemed to be a citizen of the District of Columbia for jurisdictional purposes in civil cases. 12 U.S.C. § 1717(a)(2)(B). Defendants are individuals of the full age of majority who are citizens of states other than Louisiana. Third party defendant Latter & Blum is a Louisiana corporation doing business in this judicial district.

### JURISDICTION AND VENUE

**2.**

1



This Court has subject matter jurisdiction over the action set forth in this Third Party Complaint pursuant to 28 U.S.C. § 1332 because it is a civil action between citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. Venue for this action is proper in this Court pursuant to 28 U.S.C. §1391(a), because all of the acts and omissions giving rise to Defendants' Third Party Complaint occurred in this judicial district because the property managed by Latter & Blum is situated within this judicial district.

## BACKGROUND FACTS

**3.**

Carroll Properties One LLC ("CP One") was a Washington limited liability company doing business in Louisiana.  (CP One no longer exists.)  CP One purchased an apartment complex known as Pine Grove Apartments located at 11440 Bard Ave, Baton Rouge, LA 70815 (the "Property") on September 9, 2016 for the sum of $10,000,000.00.

**4.**

To finance the purchase, CP One entered into a Multifamily Loan and Security Agreement (Non-Recourse) ("Non-Recourse Loan" or "Non-Recourse Loan Agreement") with Arbor Commercial Funding I LLC ("Arbor"), predecessor-in-interest to Fannie Mae, dated as of September 7, 2016. The loan amount was $8,000,000.00.

**5.**

In anticipation of purchase of the Property, CP One entered into a Property Management Agreement with Latter & Blum dated August 16, 2016.  A true and correct copy of the Property Management Agreement between CP One and Latter & Blum is attached hereto and made a part hereof as Exhibit I.  Pursuant thereto, CP One engaged Latter & Blum as its sole and exclusive property manager to lease and manage the Property from the time of its purchase.

**6.**

Defendant Austin Carroll executed the Property Management Agreement on behalf of CP One as its Managing Member.   Defendants were both Members of CP One at all times relevant hereto as evidenced by a copy of the records of the Louisiana Secretary of State attached hereto and made a part hereof as Exhibit II.

**7.**

Pursuant to Section 3.1 of the Property Management Agreement, Latter & Blum collected all rents and other charges from the renters and deposited those funds in an operating account, over which Latter & Blum had exclusive control.  Pursuant to Section 9.1, Latter & Blum was, among other things, responsible for maintenance and repairs to the Property through contractors, if necessary, and to purchase supplies and to pay for all maintenance expenses out of the operating account.

**8.**

CP One executed a Multifamily Note ("Note") and Multifamily Mortgage, Assignment of Leases and Rents and Security Agreement ("Mortgage") effective September 7, 2016.  The Non-Recourse Loan was secured primarily by a mortgage on the Property.  The limited exceptions to the non-recourse liability are set forth in Article 3 of the Non-Recourse Loan Agreement.

**9.**

Defendants executed a Guaranty of Non-Recourse Obligations effective September 7, 2016 ("Personal Guaranty"). Defendants' Personal Guaranty is specifically limited in relevant part to the personal liabilities of CP One under Article 3 of the Non-Recourse Loan Agreement.

**10.**

By Notice of Demand for Cure dated September 12, 2018 from Arbor on behalf of Fannie Mae, CP One was put on notice that, according to Fannie Mae, CP One was in violation of Section 6 of the Non-Recourse Loan Agreement by failing to adequately maintain the mortgaged property. As already noted, Latter & Blum was solely and exclusively responsible for maintenance of the Property.

**11.**

Arbor demanded in the Notice of Demand for Cure that CP One deposit with Arbor sums totaling $890,875.00 within thirty days thereof and that CP One immediately increase the amount of its monthly Replacement Reserve deposits.  Arbor reserved all of Fannie Mae's other rights under the Non-Recourse Loan Agreement.  As already noted, Latter & Blum was solely and exclusively in control of the operating account into which Latter & Blum was obligated to deposits rents and other funds generated by the Property.

**12.**

By letter dated October 26, 2018, counsel for Fannie Mae notified CP One that it had defaulted under Section 14.01 of the Non-Recourse Loan Agreement by failing to deposit the sums demanded by Arbor pursuant to Section 6 of the Non-Recourse Loan Agreement.  Counsel for Fannie also notified CP One that the loan was accelerated as a result of CP One's defaults and, further, of Fannie Mae's right to foreclose on the property of CP One.

**13.**

Fannie Mae filed its Verified Petition for Executory Process ("Petition") on December 28, 2018. Fannie Mae based its foreclosure suit solely on violations of Section 6 of the Non-Recourse Loan Agreement.

**14.**

Fannie Mae requested in its Petition that the state court judge appoint Latter & Blum as keeper of the Property. In response thereto, the state court judge appointed Latter & Blum as keeper of the Property as of January 24, 2019 with the full power of administration of the seized property.

**15.**

Fannie Mae improperly attempts in this proceeding to impose personal liability on Defendants as guarantors of the personal liabilities of CP One because three liens were placed on the mortgaged property before the Sheriff's Sale. Those liens were as follows: (1) $7,477.54 lien by Cornerstone Commercial Flooring, L.L.C. ("Cornerstone Lien), recorded and, therefore, a matter of public record on November 19, 2018; (2) $17,009.68 lien by Noland Company ("Noland Lien"), recorded and, therefore, a matter of public record on February 1, 2019; and (3) $12,382.50 lien by Baton Rouge Sewer & Drain Service, Inc. d/b/a Roto Rooter Plumbing ("Roto Rooter Lien") recorded and, therefore, a matter of public record on February 8, 2019. (The Cornerstone Lien, Noland Lien and Roto Rooter Lien are sometimes hereinafter referred to as "the Liens.")

**16.**

On information and belief, Latter & Blum, as manager of the Property, ordered the materials and/or labor provided by Cornerstone to the Property on or before July 31, 2018. Latter & Blum, which had exclusive control over the operating account, failed and refused to pay Cornerstone for its materials and/or labor from July 31, 2018 until the filing of the Cornerstone Lien on November 19, 2018 while Latter & Blum managed the Property.

**17.**

Latter & Blum failed and refused to pay or otherwise satisfy the Cornerstone Lien at any time after it was filed while Latter & Blum remained manager of the Property for CP One and had exclusive control of the operating account.

**18.**

Latter & Blum also failed and refused to pay or otherwise satisfy the Cornerstone Lien at any time after January 24, 2019 when the state court judge appointed Latter & Blum keeper of the Property for Fannie Mae with the full power of administration of the Property.

**19.**

On information and belief, Latter & Blum, as manager of the Property for CP One, ordered the supplies and repairs provided by Noland to the Property during the period of time from August 27, 2017 through October 30, 2018. Latter & Blum, which had exclusive control over the operating account, failed and refused to pay Noland for its materials and supplies until the filing of the Noland Lien on February 1, 2019 while Latter & Blum managed the Property for CP One. In the Financial Statement prepared by Latter & Blum for the Property for the month ended December 2018, Latter & Blum acknowledged that its aged account payable to Noland was $4,093.80 owed for 61-90 days and $11,102.46 owed for over 90 days.

**20.**

Latter & Blum also failed and refused to pay or otherwise satisfy the Noland Lien at any time after January 24, 2019 when the state court judge appointed Latter & Blum keeper of the Property for Fannie Mae with the full power of administration of the Property.

**21.**

On information and belief, Latter & Blum, as manager of the Property for CP One, ordered the plumbing repairs provided by Roto Rooter to the Property during the period of time from June 21, 2017 through July 24, 2018. Latter & Blum, which had exclusive control over the operating account, failed and refused to pay Roto Rooter for its plumbing repairs until the filing of the Roto Rooter Lien on February 8, 2019 while Latter & Blum managed the Property for CP One. In the Financial Statement prepared by Latter & Blum for the Property for the month ended December 2018, Latter & Blum acknowledged that its aged account payable to Roto Rooter was $12,382.50 owed for over 90 days.

**22.**

Latter & Blum also failed and refused to pay or otherwise satisfy the Rooter Lien at any time after January 24, 2019 when the state court judge appointed Latter & Blum keeper of the Property for Fannie Mae with the full power of administration of the Property.

**23.**

The initial one-year term of the Property Management Agreement ended August 31, 2017. Under the terms and conditions thereof, the Property Management Agreement, renewed automatically for successive one-year terms unless either party terminated the Property Management Agreement. Neither party ever terminated the Property Management Agreement. Furthermore, under the terms and conditions of the Property Management Agreement, seizure of the Property did not constitute an event of default that could have resulted in its termination.

**24.**

Sale of the Property, however, did result in termination of the Property Management Agreement. Therefore, Latter & Blum's contractual and fiduciary duties to CP One and to

Defendants as members thereof continued, even after the state court judge appointed Latter & Blum keeper of the Property for Fannie Mae, through the Sheriff's Sale of the Property on September 23, 2020.

25.

Under the terms and conditions of the Property Management Agreement, Latter & Blum had the authority to pay itself from the operating account for its property management fees and to reimburse itself for expenses and costs of operating the Property. On information and belief, Latter & Blum chose to pay itself and reimburse itself out of operating revenues in preference to paying amounts due Cornerstone, Noland and Roto Rooter (and perhaps other accounts payable) and to keep the Property in proper repair.

<u>**BREACH OF CONTRACTUAL DUTIES**</u>

26.

Defendants incorporate the allegations set forth in each paragraph stated hereinabove.

27.

Latter & Blum breached its contractual duties to CP One and to Defendants as its members by failing and refusing to pay Cornerstone, Noland and Roto Rooter for materials, supplies and repairs, resulting in the Liens being filed against the Property and in failing to pay or otherwise satisfy the Liens after they were filed. Therefore, to the extent the Liens result in personal liability of Defendants to Fannie Mae, Latter & Blum is liable to Defendants for the full amount of any judgment by Fannie Mae against the Defendants resulting from or relating to the Liens.

28.

To the extent waste occurred to the Property, Latter & Blum breached its contractual duties to CP One and to Defendants as its members by failing to keep the Property in proper repair.

Therefore, to the extent waste to the Property results in personal liability of Defendants to Fannie Mae, Latter & Blum is liable to Defendants for the full amount of any judgment by Fannie Mae against the Defendants resulting from or relating to waste to the Property.

## BREACH OF FIDUCIARY DUTIES

### 29.

Defendants incorporate the allegations set forth in each paragraph stated hereinabove.

### 30.

Latter & Blum breached its fiduciary duties to CP One and to Defendants as its members by failing and refusing to pay Cornerstone, Noland and Roto Rooter for materials, supplies and repairs, resulting in the Liens being filed against the Property and in failing to pay or otherwise satisfy the Liens. Instead, on information and belief, Latter & Blum chose to pay itself with operating revenues that could have been used to pay Cornerstone, Noland and Roto Rooter, or to otherwise satisfy the Liens.  Therefore, to the extent the Liens result in personal liability of Defendants to Fannie Mae, Latter & Blum is liable to Defendants for the full amount of any judgment by Fannie Mae against the Defendants resulting from or relating to the Liens.

### 31.

To the extent waste occurred to the Property, Latter & Blum breached its fiduciary duties to CP One and to Defendants as its members by failing to keep the Property in proper repair. Instead, on information and belief, Latter & Blum chose to pay itself with operating revenues that could have been used to keep the Property in proper repair.  Therefore, to the extent waste to the Property results in personal liability of Defendants to Fannie Mae, Latter & Blum is liable to Defendants for the full amount of any judgment by Fannie Mae against the Defendants resulting from or relating to waste to the Property.

## THIRD PARTY BENEFICIARIES

### 32.

Defendants incorporate the allegations set forth in each paragraph stated hereinabove.

### 33.

As members of CP One, Defendants are direct beneficiaries of the contractual and fiduciary duties owed by Latter & Blum under the Property Management Agreement. In the alternative, Defendants, as members of CP One, are third party beneficiaries of the Property Management Agreement.

### 34.

Therefore, to the extent the Liens result in personal liability of Defendants to Fannie Mae, Latter & Blum is liable to Defendants, in the alternative as third party beneficiaries, for the full amount of any judgment by Fannie Mae against the Defendants resulting from or relating to the Liens.

### 35.

Also, to the extent waste to the Property results in personal liability of Defendants to Fannie Mae, Latter & Blum is liable to Defendants, in the alternative as third party beneficiaries, for the full amount of any judgment by Fannie Mae against the Defendants resulting from or relating to waste to the Property.

**WHEREFORE,** Defendants reiterate that they are not liable to Fannie Mae for any amounts in this proceeding. In the alternative, should Defendants be cast in judgment, Defendants pray that, after due proceedings, there be judgment in favor of Defendants against Latter & Blum in the full amount of any judgment in favor of Fannie Mae against Defendants. Defendants also

pray for costs, attorney fees if allowable and all other damages and legal and equitable relief against Latter & Blum to which Defendants may be entitled as proved at trial.

Respectfully submitted,

ROEDEL, PARSONS, BLACHE,
FONTANA, PIONTEK & PISANO
8440 Jefferson Hwy., Suite 301
Baton Rouge, LA 70809-7652
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

/s/W. L. WEST (T.A.)
W. L. WEST (# 13377)
cwest@roedelparsons.com
BRADLEY C. GUIN (# 38762)
bguin@roedelparsons.com
DANIEL T. PRICE (# 39500)
dprice@roedelparsons.com

*Counsel for Defendants/Third Party Plaintiffs*

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **FEDERAL NATIONAL MORTGAGE ASSOCIATION (FNMA) D/B/A FANNIE MAE** | **CIVIL ACTION NO. 21-551** |
| | **JUDGE: SHELLY D. DICK** |
| **VERSUS** | **MAGISTRATE JUDGE: RICHARD L. BOURGEOIS, JR.** |
| **CEBARN CARROLL AND AUSTIN CARROLL** | |

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system this _____ day of October, 2022.  All counsel will be served through the CM/ECF system. There are no non-CM/ECF participants.

<u>/s/W. L. WEST (T.A.)</u>
W. L. WEST (# 13377

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this 15th day of August, 2016 ("Execution Date") by and between Carroll Properties One, LLC (hereinafter referred to as the "OWNER") and Latter & Blum Property Management, Inc. (hereinafter referred to as "Manager").

### SECTION 1

### APPOINTMENT OF MANAGING AGENT

1.1     APPOINTMENT AND ACCEPTANCE:  Owner hereby engages Manager as its sole and exclusive property manager to lease and manage the property described in Section 1.2 upon the terms and conditions provided herein. Manager accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein.

1.2     DESCRIPTION OF PROJECT:  The property to be managed by Manager under this Agreement (the "Project") is known as Pine Grove Apartments, and is located at 11440 Bard Ave, Baton Rouge, LA 70815, consisting of the land, buildings and other improvements constituting a 204 unit apartment complex.

1.3     TERM:  The initial term of this Agreement shall be for a period of twelve months (the "Initial Term") commencing on the 15th day of August, 2016 ("Effective Date"), and continuing to the 31st day of August, 2017.  Unless otherwise specified herein, Owner's and Manager's obligations hereunder shall commence on the Effective Date and shall continue until this Agreement is terminated.  This Agreement shall be automatically renewed for periods of one (1) year, unless this Agreement is terminated as provided in Section 18 herein.

1.4     MANAGEMENT OFFICE:  Owner shall provide adequate space on the Project for a management office, exclusively for the use of Manager to conduct the business of the management of the Project.  Owner shall pay all reasonable expenses related to such office as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities, and telephone services.

1.5     APARTMENT FOR ON-SITE STAFF:  Where Owner and Manager deem it desirable for there to be a resident Manager or Assistant Manager, Owner shall provide suitable apartment unit(s) within the Project for the use of the resident manager and such assistant managers or maintenance personnel as Manager and Owner may deem reasonable under the circumstances and as provided in the Plan. Manager, with the approval of Owner, shall be entitled to provide such on-site staff (employees) with such rental concessions (reductions in rent) as Manager and the Owner may deem necessary and appropriate under the circumstances.

1.6     BUDGET AND BUSINESS PLAN:  Owner and Manager will establish a budget and business plan for operation and management of the Project (the "Plan").  The Plan shall act as a general guide for the management of the Project by Manager, and shall be updated and revised from time to time to reflect changes in conditions and actual Project operation.  Any significant expenditure not specifically set forth in the Plan shall require Owner's advance approval, except as provided in Section 4.2 hereof.  Owner agrees that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance.  The Plan shall include, at a minimum, the following:

A.     Minimum Leasing Guidelines established jointly by Owner and Manager, setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes. If Manager executes any lease (or any renewal or extension thereof) on terms

1



EXHIBIT

I

which vary from the minimum leasing guidelines, Manager will promptly notify Owner.

B.    Intentionally deleted

C.    <u>Owner Provided Information</u>:  In preparing the Budget and Business Plan, and in meeting its duty to cooperate with Manager in connection with Manager's management of the Project, Owner shall be solely responsible for specifying to Manager any and all requirements by Owner's Lenders, partners, investors, and other third parties relating to the operation of the Project, and Owner agrees to defend, indemnify and hold Manager harmless from any and all claims, suits and damages resulting from Owner's failure to do so.

## SECTION 2

## BANK ACCOUNTS

2.1    <u>BANK ACCOUNTS</u>: Manager is authorized to establish one or more operating trust accounts and security deposit trust accounts for the Project.  Operating trust accounts are hereinafter referred to as "operating accounts".  All other accounts are hereinafter referred to as "trust accounts".  Manager shall deposit into the trust accounts all security and other deposits made by tenants, unless directed otherwise by Owner.  All other funds shall be placed in one operating account.  All trust accounts shall be operated in conformance with state law. Manager shall designate one or more Manager employees who shall be the only parties authorized to draw upon such accounts.  No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Manager.  All bank accounts shall be established at such banks or other institutions whose deposits are insured by the federal government.  All such depository banks shall be selected by Manager and shall be satisfactory to Owner. Manager shall not be liable to Owner in the event of bankruptcy or failure of a depository institution.  .

2.2    <u>INITIAL DEPOSIT TO TRUST ACCOUNTS</u>:  Immediately upon commencement of this Agreement, Owner shall remit to Manager such amounts as may be necessary in order to fully fund all required tenant trust accounts.  If state law allows, and Owner elects to not fully fund tenant trust accounts, Owner agrees to indemnify and hold Manager harmless from any claims that may result from such an election and agrees to sign a security deposit waiver addendum, if required by state law.  Any refunds due to Tenant from funds held by Owner shall be funded out of the Operating Account.

2.3    <u>INITIAL DEPOSIT FOR RESERVES</u>:  Immediately upon commencement of this Agreement, Owner shall remit to Manager a sum to be deposited in the operating account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement, plus an adequate contingency reserve.  The initial deposit may be funded from the first month's rental receipts, at the option of Owner.  Owner agrees to maintain such contingency reserve at all times in the operating account so as to enable Manager to pay the obligations of Owner under this Agreement as they become due.  Owner and Manager shall review the amount of the contingency reserve from time to time and shall agree in writing upon a new contingency reserve when such is required.

2.4    <u>MANAGER'S OBLIGATION TO ADVANCE PAYMENTS</u>:  All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of Owner.  All such purchases shall be made by Manager solely on behalf of Owner and not as a principal. Manager shall be under no duty to utilize or apply Manager's own funds for the payment of any such debt or obligation.  In the event that there are insufficient funds in the

2

operating account, Manager may, after notifying Owner, advance its own funds for such purpose, in which event Owner shall promptly repay to Manager all such sums expended, together with interest at the rate of twelve percent (12%) per annum calculated from the date of Manager's advancement of funds to the date of repayment from Owner. However, Owner agrees that nothing contained herein shall be construed as requiring Manager to advance funds for the operation, repair or preservation of the Project.

2.5    INTEREST ON TRUST ACCOUNTS:    Where permitted by law, and where feasible, Manager shall deposit trust funds into interest-bearing accounts at Owner's request. All interest earned on such funds shall belong to Owner, except where state law requires interest earned on security deposits to be paid to a tenant and shall not be considered part of "gross receipts" of the property as hereinafter defined.

## SECTION 3

## COLLECTION OF RENTS AND OTHER RECEIPTS

3.1    AUTHORITY OF MANAGER: Manager shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be deposited into the trust account described in Section 2.1 above. All other receipts shall be deposited into the operating account. Under no circumstances shall Manager be liable to Owner for any uncollected rents, other income or bad debt resulting from operations,

3.2    SPECIAL CHARGES: Manager shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

## SECTION 4

## DISBURSEMENT FROM OPERATING ACCOUNTS

4.1    OPERATING EXPENSES:    From the operating account, Manager is authorized to pay or to reimburse Manager for all expenses and costs of operating the Project set forth in the Plan and for all other sums due Manager under this Agreement, including Manager's compensation which is described and set forth in Section 15 hereof, in accordance with the Plan. Owner has sole responsibility for the timely payment of all authorized expenses of the Project. Manager shall not be responsible for the payment of late fees or penalties. Owner authorizes Manager to reimburse itself for those fees set forth on Exhibit A to this Agreement. Upon 30 days notice by Manager to Owner that Manager has used its own funds to pay authorized Project expenses, Owner shall reimburse Manager, including interest at the annual rate of twelve percent (12%).

4.2    EXTRAORDINARY EXPENSES:    Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $5,000.00 shall be allowable without prior approval of Owner. Owner may request written bids for any expenditures over $10,000.00. Manager is required to submit a minimum of three (3) written bids for all expenditures over $25,000.00. However, in the event of an emergency, owner authorizes Manager to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Manager shall, however, as soon as reasonably possible, notify Owner in detail, concerning such expenditures.

3

4.3     <u>AUTHORITY OF OWNER FOR MANAGER TO PAY CERTAIN EXPENSES:</u>
Manager shall pay from the Project operating account, in accordance with the business plan or as
otherwise directed by Owner, all utility and maintenance charges; all real property taxes and
assessments; all premiums for liability and casualty insurance; all monthly payments upon
underlying secured real property debt; Manager's fees; all other operating and rental expenses
set forth herein; postage, copying, long distance charges and other expenses that are directly
associated with the property (whether incurred on-site or otherwise); the costs and expense of
uniforms for employees (where applicable) and the costs and expenses directly associated with
the training of Project employees.

4.4     <u>EXPENSES TO BE PAID DIRECTLY BY OWNER:</u>  In addition to income taxes
and gross receipt taxes (if any) incurred as a result of the operation of the Project, Owner shall
pay directly the following:

TO BE DETERMINED

4.5     <u>FEES FOR LEGAL ADVICE:</u>  Owner shall pay reasonable expenses incurred by
Manager in obtaining legal advice regarding compliance with any law affecting the Project,
including the defense of vendor suits or other claims made against the Project or Manager
relating to its activities as Agent for Owner, or activities related to the operation of the Project.
Manager shall notify the Owner if legal services are anticipated to exceed the amounts set forth in
the Plan.  If any expenditure for legal services also benefits others for whom Manager acts as a
property manager, Owner's obligation shall be limited to Owner's pro rata portion of such
expense for legal services.  Provided, however, that nothing contained in this section shall
obligate Owner to pay Manager's legal fees in the event Manager is adjudged to have engaged in
fraud or misconduct relating to the allegations of the dispute.

4.6     <u>NET PROCEEDS:</u>  To the extent that funds are available, and after maintaining a
cash contingency reserve amount as specified in Section 2.3, Manager shall transmit net cash
proceeds to Owner at the request of Owner.  Such periodic cash payments shall be remitted to
the following address:

TO BE DETERMINED

4.7     <u>PRIORITY OF PAYMENT:</u>  Should collected funds (excluding security deposits
deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the
Project, such debts and obligations shall be paid in the following order:  Project payroll, including
all related administrative charges and expenses; management fees and related expenses due
Manager; charges by utility companies (including, but not limited to, gas electric, water, sewer,
garbage and cable television); other Project expenses; underlying secured real property debt;
other required payments, including payments to reserve accounts.  Where the terms of any loan
security agreement with Owner conflict with the terms of this section, the terms of such loan
security agreement shall control, provided, the Owner has notified Manager of the existence of
any such condition.

## SECTION 5

## <u>FINANCIAL AND OTHER REPORTS</u>

5.1     <u>REPORTS:</u>  By the 25<u>TH</u> business day of each month, Manager shall furnish to
Owner a statement of receipts and disbursements from the operation of the Project during the
prior calendar or fiscal month. Such reports are prepared solely for the benefit of Owner.  The

Manager makes no representations or warranties regarding the financial performance of the Property. In addition, Manager shall, on a mutually acceptable schedule and at Owner's request, prepare and submit to Owner such other reports as Owner shall reasonably specify, including, but not limited to the following:

  a.) occupancy, leasing status and traffic reports.
  b.) market comparable rent survey.
  c.) bank reconciliations.

5.2    OWNER'S RIGHT TO AUDIT:    Owner shall have the right to request periodic audits of all applicable accounts managed by Manager and the cost of such audits shall be paid by Owner, as an expense of the Project.  Such audits may be made during normal business hours posted at the property with advance written notice by Owner to Manager of not less than thirty (30) days.  Owner shall indemnify and hold harmless Manager from any liability to third-parties resulting from the distribution by Owner of any financial information provided to Owner regarding the Project under this Agreement.

## SECTION 6

## ADVERTISING

6.1    ADVERTISING: Manager is authorized to advertise the Project and vacant units within the Project for rent and employment, using periodicals, signs, plans, brochures or displays, or such other means as Manager may deem proper and advisable. Manager is authorized to place signs on the Project advertising that units are available for rent, provided such signs comply with applicable laws.  The cost of such advertising shall be paid out of the operating account, in accordance with the advertising budget or as approved by Owner.  All advertising shall make clear that Manager is the manager and is not the Owner of the Project, and Owner hereby permits Manager to place reasonable signage on the Property signifying that Manager is the manager of the Project. Manager shall have the right to publish advertisements that share space with other properties managed by Manager.

## SECTION 7

## LEASING AND RENTING

7.1    MANAGER'S AUTHORITY TO LEASE PROJECT: Manager shall use its best efforts to keep the Project rented by procuring tenants for the Project. Manager is authorized to negotiate, prepare and execute all rental agreements, including all renewals and extensions of rental agreements, and to cancel and modify existing rental agreements subject to the Plan. Manager shall execute all rental agreements as agent for the Owner.  All costs of leasing shall be paid out of the operating account, in accordance with the leasing budget or as approved by Owner.  No rental agreement shall be for a period in excess of one (1) year without the approval of Owner.

7.2    NO OTHER RENTAL AGENT:    During the term of this Agreement, Owner shall not authorize any other person, firm or corporation to negotiate or act as leasing or rental agent with respect to any leases for commercial or residential space in the Project.  Owner agrees to promptly forward all inquiries about leases or rental agreements to Manager.

7.3    RENTAL RATES:    In accordance with the provisions of the Plan or as otherwise directed by Owner, Manager may establish and set or revise all rents, fees or other deposits, and all other charges chargeable with respect to the Project. Manager shall be authorized to promote the occupancy of the Project by granting rental concessions and other promotional bonuses to prospective and current tenants, after first consulting with Owner as to the nature, quantity and duration of such rental concessions and promotional bonuses.

7.4     <u>ENFORCEMENT OF RENTAL AGREEMENTS:</u> Manager is authorized to institute and defend, in Owner's name or in the name of Manager, all legal actions or proceedings for the enforcement of any rental term, for the collection of rent or other income due to the Project, or for the eviction or dispossession of tenants or other persons from the Project and matters relating thereto. Manager is authorized to sign and serve such notices as Manager and Owner deem necessary for the enforcement of rental agreements, including the collection of rent and other income. Manager may settle, compromise and release such legal actions or suits or to reinstate such tenancies without the prior consent of Owner, if such settlement, compromise, or release shall involve an amount in controversy of One Thousand Dollars ($1,000), or less. Where the amount in controversy is in excess of One Thousand Dollars ($1,000), Manager shall first obtain the authorization of Owner before entering into any compromise, settlement, or release of such legal action.  Any moneys for such settlements paid out by Manager shall be an operating expense of the Project.  Reasonable attorney's fees, filing fees, court costs and other necessary expenditures incurred in the connection with such action shall be paid out of the Project operating account or shall be reimbursed directly to Manager by Owner.  All funds recovered by tenants shall be deposited into the Project operating account. Unless otherwise directed by Owner, Manager may select the attorney or attorneys to handle any and all such litigation.  Absent a finding of gross negligence or misconduct by Manager's employees, Owner shall be responsible for all claims, damages and legal expenses relating to the lease or other housing statutes, whether brought against the Owner or Manager as the Agent of Owner.

**SECTION 8**

**PROJECT EMPLOYEES**

8.1     <u>MANAGER'S AUTHORITY TO HIRE:</u> Manager is authorized to hire, supervise, discharge and pay all servants, employees, contractors or other personnel necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the Plan guidelines.  All employees performing services directly for the Project (excluding off-site property manager) shall be deemed to be employees of Manager and the Project.  Manager is an equal opportunity employer.  When requested by Owner, Manager shall consult with Owner in decisions relating to the hiring, promotion and termination of Project employees; provided, however, that Owner shall indemnify Manager for any employment decision made by Owner related to Project employees that leads to an unlawful employment practices claim.

8.2     <u>OWNER TO REIMBURSE EMPLOYEE EXPENSES:</u>  All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, employees of the Project (but not to property managers not employed directly by the Project) and all local, state and federal taxes and assessments (including, but not limited to, payments to and administration of fringe benefits, employee benefits insurance program, Worker's Compensation, Social Security taxes and Unemployment Insurance) incident to the employment of all such personnel and their direct training, shall be subject to a thirty percent (30%) burden, and all such costs shall be treated as an operating expense of the Project and shall be paid by Manager from Owner's funds, from the Project operating account subject to the Plan.  In addition, Manager shall accrue for all vacation pay due site employees and provide a quarterly reconciliation to Owner of all such payments. Such payments shall also include all awards of back pay and overtime compensation that may be awarded to any project employee in any legal proceeding, or in settlement of any action or claim that has been asserted by any such employee. Owner shall pre-pay Project payroll thirty days in advance and authorizes Manager to maintain a credit for thirty days of estimated Project payroll for the term of this Agreement.

8.3     <u>MANAGER'S AUTHORITY TO FILE RETURNS:</u> Manager shall do and perform all acts required of an employer with respect to the Project and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or

6

ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. The costs for preparing such filings shall be a Project expense and included within the expenses specified in Section 8.2 above. In connection with such filings, Owner shall, upon request, promptly execute and deliver to Manager all necessary powers of attorney, notices of appointment and the like. Owner shall be responsible for all amounts required to be paid under the foregoing laws, and Manager shall pay the same from the operating account.

8.4    WORKER'S COMPENSATION INSURANCE/TAXES: Manager shall, at Owner's expense (but included within the employee expenses specified in Section 8.2, above), maintain and administer a Worker's Compensation Insurance program covering all liability of Manager and the Project under established worker's compensation laws and all other Federal and State labor laws, whether such laws provide that such insurance shall be obtained from a third party carrier or from a state fund and whether such payments shall be denominated as insurance premiums or taxes. Individual properties are assessed their prorated portion of Manager's total worker's compensation premium based on the number of employees at each Project. The total of the premium may be less than the gross amount collected from all properties managed by Manager. Manager waives all rights of subrogation against Owner with respect to any and all employee claims for worker's compensation.

## SECTION 9

## OPERATIONS, MAINTENANCE AND REPAIR

9.1    PERFORMANCE OF REPAIRS: Manager is authorized to make or cause to be made, through Project employees, Manager's employees, or through contracted services, all ordinary repairs and replacements reasonably necessary to preserve the Project in its present condition and for the operating efficiency of the Project, and all alterations required to comply with rental agreement requirements, government regulations or insurance requirements. In accordance with the operating budget (the Plan) or as otherwise directed by Owner, Manager is also authorized to decorate the Project and the individual apartment units and to purchase or rent, on Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance or operation of the Project. Such maintenance and decorating expenses shall be paid out of the operating accounts. If Owner selects a vendor for use on the Project, Owner shall indemnify and hold Manager harmless from any and all damages that arise from the use of such vendor.

9.2    FEES FOR WORK PERFORMED BY MANAGER'S EMPLOYEES: With Owner's prior approval, Manager may cause repairs and replacement work to be performed by employees for Manager who are not otherwise direct employees of the Project. Owner shall pay to Manager a reasonable fee for such services based upon the then current hourly charges made and assessed by Manager for the performance of such services. Such charges shall be approximately equal to Manager's direct and indirect expenses associated with the employment of such person. Such charges shall be reasonable and shall not be more than charges made by qualified independent contractors performing similar work, under similar circumstances, in the same geographical area as the Project.

9.3    CONTRACTS, UTILITIES AND SERVICES: Manager is authorized to negotiate contracts for non-recurring items of expense, not to exceed $5,000.00. Manager shall enter into agreements for all necessary repairs, maintenance, minor alterations, and utility services, and make contracts on Owner's behalf for electricity, gas, telephone, fuel, water and such other services required for the operation of the Project, in accordance with the Plan. All utility deposits shall be the Owner's responsibility, and with Owner's approval Manager may pay the same from the operating accounts.

7

*Revised 12/09/14*

9.4     <u>LIMITATIONS ON CONTRACTS:</u>  Each such contract or agreement shall: (a) be in the name of the Project, (b) be assignable, at Owner's option, to Owner or Owner's nominee, and (c) shall require that all contractors provide evidence of sufficient insurance.  If this agreement is terminated pursuant to Section 18, Manager shall, at Owner's option, assign to Owner or Owner's nominee all contracts and agreements pertaining to the Project. Manager shall then notify Owner if any such contracting entity is either a subsidiary, affiliate, or has any other relationship whatsoever to Manager.

## SECTION 10

## RELATIONSHIP OF MANAGER TO OWNER

Manager is engaged independently in the business of property management and acts hereunder as an independent contractor.  Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Manager to bear any portion of losses arising out of or connected with the ownership or operation of the Project.  Manager does not warrant the financial performance of the Project.  Manager shall not, at any time during the term of this Agreement, be considered to be a direct or indirect employee of Owner.  Owner agrees to assume all financial risks of operating the project including any claims made against Manager while acting as Owner's Agent within the scope of its authority as provided herein.  Owner agrees to hold Manager harmless for any and all claims arising prior to Manager's management of the Project.  Except as provided herein, neither party shall have the power to bind or obligate the other party.  Except as specifically set forth in this Agreement, Manager shall not act as the agent of Owner; and, except as provided in this Agreement, Owner shall not act as the principal of Manager.

## SECTION 11

## INDEMNIFICATION AND INSURANCE

11.1     <u>INDEMNIFICATION BY OWNER</u>

A.     <u>Indemnification for Injuries to Person and Property</u>:  Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liability including but not limited to pollution or environmental, and all costs and expenses thereof (including, but not limited to, fines penalties and reasonable attorney fees), for injuries or damages including economic losses, to persons and Owner, including any employee of Owner, or property including, but not limited to, those relating to or arising out of the premises of the Project, or in any manner resulting from or arising out of the performance by Manager of its services under this Agreement, except for that which is caused by the gross negligence or willful misconduct of Manager.  To the extent permitted under controlling law, this obligation to indemnify includes claims caused by the sole negligence of Manager.

B.     <u>Indemnification for Violation of Law</u>:  Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as well as all costs and expenses thereof, (including, but not limited to, fines, penalties, and reasonable attorney fees) involving an alleged or actual violation by Owner of any statute, rule or regulation pertaining to the premises, property, the management or the operation of the Project, except to the extent that such a claim, proceeding or liability resulted from the gross negligence or willful misconduct of Manager.  Owner will immediately assume the duty to defend Manager if any such allegations potentially fall within the scope of this indemnity obligation.

C.     <u>Indemnification for Vendor and Tenant Claims.</u>  Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as

8

well as all costs and expenses thereof, (including, but not limited to, fines, penalties, and reasonable attorney fees) involving an alleged or actual violation of a landlord/tenant act or an action to collect a debt by a vendor of the Project, except to the extent that such a claim, proceeding or liability resulted from the gross negligence or willful misconduct of Manager.  Owner will immediately assume the duty to defend Manager if any such allegations potentially fall within the scope of this indemnity obligation.

D.    Indemnification for breach of duty of cooperation.  Owner shall be under a continuing duty to cooperate fully with Manager in connection with Manager's management of the Project.  In meeting its duty to cooperate with Manager, Owner shall be solely responsible for specifying to Manager any and all requirements by Owner's Lenders, partners, investors, and other third parties relating to the operation of the Project, and providing such other information as Manager shall reasonably require, and Owner agrees to defend, indemnify and hold Manager harmless from any and all claims, suits and damages resulting from Owner's failure to do so.

E.    Indemnification for acts occurring prior to the date of this Agreement.  Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as well as all costs and expenses thereof, (including, but not limited to, fines, penalties, and reasonable attorney fees) involving any act relating to the Project or the management thereof, that occurred prior to the effective date of this Agreement.

11.2    INDEMNIFICATION BY MANAGER

A.    Indemnification for Employment Claims:  Subject to Paragraph 11.1, Manager shall indemnify, defend and save Owner harmless from any and all claims, proceedings or liabilities relating to Manager's employees, and all costs and expenses thereof, (including, but not limited to, fines, penalties and reasonable attorney fees) arising out of the alleged or actual violation by Manager of labor, employment or discrimination laws.  Provided, however, this indemnity shall not be applicable where such claim, proceeding or liability resulted from the negligence or willful misconduct of the Owner or if Owner has not furnished Manager with sufficient funds to perform Manager's obligations under this Agreement.

B.    Reimbursement for Benefits Owed:  Owner shall reimburse Manager for payments made by Manager to any Project employee, where the Project employee claims, for whatever reason, previously unpaid wages, including but not limited to, overtime compensation, fringe benefits, and other forms of compensation, which are held to be payable to the Project employee by any court or administrative agency having jurisdiction over the matter, or by reason of any settlement made by Manager.  This reimbursement shall not be applicable where such claims are caused by the willful misconduct of Manager.

11.3    WAIVER OF CLAIMS:  Owner hereby waives any and all claims against Manager, including Manager's employees, agents, general partners and affiliates, for damage or injury to any property in, upon, or about the Project, including but not limited to, the premises of the Project, whether caused by peril, accident, theft or from any other cause whatsoever, other than solely caused by the gross negligence or willful misconduct of Manager.

11.4    SCOPE OF INDEMNITY:  Any party's duty to indemnify any other party, as provided for in Section 11 hereof, shall include the obligation to defend the indemnified party in any such action.  All costs and expenses of such defense shall be borne by the indemnifier.  In the event the indemnitee deems it necessary or expedient to procure legal representation in such proceeding in order to protect the indemnitee's rights therein, all costs and expenses of such defense (including but not limited to reasonable attorney's fees) shall be borne by the indemnitor.

9

The indemnitor waives for itself and for its insurance carriers any rights of subrogation which the indemnitor's insurance carriers may have against the indemnitees.

11.5    BONDING: Manager shall cause all personnel who handle or are responsible for the safe keeping of money or other property of Owner to be covered by a fidelity bond or applicable insurance in the minimum amount of Fifty Thousand Dollars ($50,000.00) with a company determined by Manager,.

11.6    TERM OF INDEMNIFICATION:  The indemnification made by any party to this Agreement, for and on behalf of any other party to this Agreement, for and on behalf of any other party to this Agreement, shall survive the termination of this Agreement.

**SECTION 12**

**INSURANCE**

12.1    INSURANCE BY OWNER:

A.    Property Insurance:  At all times during the term of this Agreement, and at its sole cost and expense, Owner shall obtain and keep in force for the benefit of Owner and Manager Property Insurance on an "all-risk basis" (open perils), including but not limited to, full coverage for boiler machinery and pressure vessel insurance, vandalism and malicious mischief.  The amount of such insurance shall be 100% of the actual replacement cost of the building and improvements, including the costs of demolition and debris removal, all as reasonably determined by agreement of the Owner and Manager. In obtaining any policies of insurance required hereunder, Owner, shall require all insurers to waive any rights of subrogation against Manager.

B.    General Liability Insurance:  At all times during the term of this Agreement, and at its sole cost and expense, Owner shall obtain and keep in force for the benefit of Owner and Manager Commercial General Liability Insurance through one or more primary and/or umbrella liability polices against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide contractual liability coverage as well.  The policies shall be written on an occurrence basis with limits of not less then $1,000,000 per occurrence and $2,000,000 in the aggregate and a $3,000,000 umbrella annually for the term of the Agreement.  Any deductible or SIR (self insured retention amount) under such insurance policy(ies) shall be the sole responsibility of the Owner.

C.    Additional Insured and Primacy of Owner's Insurance: Manager shall be named as an additional insured on all of the above policies for all purposes connected to this Agreement.  It is the intent of the parties that the Owner's insurance be primary to any, if any, insurance procured by Manager.  Said insurance purchased by Manager shall not contribute in any way.  Owner will secure endorsements to this effect from all insurers of such policies.

D.    General Provisions:  All insurance shall be written with insurance companies with an A.M. Best's rating of a A:VIII or higher.  All liability and auto insurance shall contain a severability of interest clause.  All insurance shall provide that notice of default or cancellation shall be sent to Manager as well as Owner and shall require a minimum of thirty (30) days written notice to Manager prior to any cancellation of or changes to said policies.  Owner agrees to provide Manager with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement.  If Owner fails to do so, Manager may, but shall not be obligated to, place said insurance and charge the cost thereof to the operating account.

10

12.2     INSURANCE BY MANAGER:

    A.     Worker's Compensation and Employer's Liability Insurance.  Manager shall provide Worker's Compensation coverage as specified in Section 8.4.  Manager shall further provide Employer's Liability coverage in amounts of not less than $1,000,000.00 per accident/disease per employee.

    B.     Commercial General Liability Insurance.  At all times during the term of this Agreement, and at its sole cost and expense, Manager shall obtain and keep in force for the benefit of Owner and Manager Commercial General Liability Insurance through one or more primary and/or umbrella liability polices against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide completed operations and contractual liability coverage as well.  The policies shall be written on an occurrence basis with limits of not less then $1,000,000 per occurrence and $2,000,000 in the aggregate for the term of the Agreement.  Any deductible or SIR (self insured retention amount) under such insurance policy(ies) shall be the sole responsibility of the Manager.  The Owner shall be named as an additional insured for the coverages specified in this paragraph.

    C.     Automobile Liability Insurance.  To the extent that Manager provides motor vehicles for its employees in connection with the management of the Property, Manager shall obtain and keep in force for the benefit of Owner and Automobile Liability Insurance polices against claims for bodily injury, property damage, advertising injury and personal injury.  The policies shall be written on an occurrence basis with limits of not less then $1,000,000 per occurrence.  Any deductible or SIR (self insured retention amount) under such insurance policy(ies) shall be the sole responsibility of the Manager.

    D.     Professional Liability Insurance:  Manager shall procure and maintain insurance against the misfeasance, malfeasance, or non-feasance (errors and omissions) of Manager relating to the management of the Project, with limits of not more than One Million Dollars ($1,000,000.00).

    E.     Fidelity and Forgery Coverage.  Manager shall procure and maintain Fidelity coverage with limits of not less than $650,000.00, and Forgery coverage with limits of not less than $150,000.00.

    F.     Employment Practices Liability:  Manager shall procure Employment Practices Liability insurance covering all of Manager's employees at the Premises, in an amount not less than One Million Dollars ($1,000,000).

    G.     General Provisions:  All insurance shall be written with insurance companies with an A.M. Best's rating of a A: VII or higher.  All liability and auto insurance shall contain a severability of interest clause.  All insurance shall provide that notice of default or cancellation shall be sent to Owner as well as Manager and shall require a minimum of ten (10) days written notice to Owner prior to any cancellation of or changes to said policies.  Manager agrees to provide Owner with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement. Notwithstanding any agreement herein to the contrary, the parties agree that the standard language in the policies of insurance issued to the owner and manager, respectively, shall govern the application of insurance coverage to any and all claims, suits, or causes of action asserted against the owner, manager, or either of them.  Specifically, the determination of which policy or policies are primary, and which are excess and/or secondary, shall be based on the language of the policies issued to the parties and not on the language in the "Indemnification" section of this

11

agreement. The provisions of Section 11, "Indemnification", shall be applicable by and between the parties to those incidents where all applicable insurance coverage is exhausted, or where there is no available insurance coverage.

## SECTION 13

### MANAGER ASSUMES NO LIABILITY

Manager assumes no liability whatsoever for any acts or omissions of Owner or any previous owners of the Project, or any previous property managers or other agents of either Owner or Manager. Manager assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any rental agreement or otherwise unless solely caused by willful misconduct of Manager. Nor does Manager assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect. Any environmental violations or hazards discovered by Manager shall be brought to the attention of Owner in writing and Owner shall be solely responsible for such violations, hazards or claims arising from such conditions. Further, Manager assumes no liability for the financial performance of the Project. Owner shall be solely liable for all vendor claims and tenant claims, whether made against the Owner or Manager, for all acts or omissions of Manager within the scope of its agency; provided however, that Manager shall remain liable for the willful misconduct of its employees.

## SECTION 14

### ASSIGNMENT OF RIGHTS AND OBLIGATIONS

This Agreement may not be assigned, in whole or in part, without the written consent of the other party hereto.

## SECTION 15

### MANAGER'S COMPENSATION AND EXPENSES

15.1    COMPENSATION:    As compensation for the services provided by Manager under this Agreement (and exclusive of reimbursement of expenses to which Manager is entitled hereunder, including that specified in Exhibit A hereto), Owner shall pay Manager the following compensation.

15.2    A.    FOR MANAGEMENT SERVICES: The greater of Four percent (4%) of the total monthly gross receipts from the Project, or $3,500.00 per month ("Monthly Minimum"). The Monthly Minimum shall be paid by the 10th day of the current month, and if it is determined that additional compensation for Management Services is owed, then such sum shall be paid by the 10th day following such determination. Payments due Manager for periods of less than a calendar month shall be prorated over the number of days for which compensation is due.

The term "gross receipts" shall be deemed to include all rents and other income and charges from the normal operation of the Project, including, but not limited to, rents, parking fees, net laundry income, forfeited security deposits, pet deposits, other fees and deposits, and other miscellaneous income. Gross receipts shall not be deemed to include income arising out of the sale of real property or the settlement of fire or other casualty losses and items of a similar nature; however, any portion of an insurance settlement that provides for loss of rents shall be considered part of gross receipts.

12

B.    <u>FOR OTHER SERVICES</u>:  For other related real estate services, including, but not limited to construction management and due diligence on sale, refinance or other disposition, the Parties agree to negotiate a reasonable fee to be paid to Manager.

15.3    <u>ACTS OF GOD</u>:  In the event of a casualty loss due to Acts of God and/or other insurance claims such as, without limitation, hurricanes, tornadoes, earthquakes, fires or floods, where the Project lender allows restoration of damage to the Project, if Owner engages Manager to oversee such restoration work under a separate written agreement, Owner agrees to reimburse Manager five percent (5%) of the total cost of the reconstruction project for overseeing the project to completion provided that said fee is reimbursed in its entirety under the provisions of Owner's insurance policy.

15.4    <u>CONSTRUCTION MANAGEMENT SERVICES</u>: If Owner engages Manager to oversee Project Improvements, over and above routine maintenance, such improvements shall be performed under a separate written agreement to be negotiated by and between the parties.

15.5    <u>FOR OTHER ITEMS OF MUTUAL AGREEMENT:</u>  Should Owner wish Manager to perform services which are not otherwise governed by the terms and provisions of this Agreement, the parties shall meet to discuss and to agree upon the additional compensation to be paid by Owner to Manager for such additional services.

15.6    <u>INTEREST ON UNPAID SUMS:</u>  Any sums due Manager under any provision of this Agreement, and not paid within thirty (30) days after such sums have become due, shall bear interest at the rate of twelve percent (12%) per annum.

## SECTION 16

## STRUCTURAL CHANGES

Owner expressly withholds from Manager any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owner other than expenses related to exercising the express powers vested in Manager through this Agreement, without the prior written consent of Owner.  However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal state or local laws, regulations or ordinances, shall be authorized pursuant to section 4.2 of this Agreement, and Manager shall notify Owner appropriately.

## SECTION 17

## BUILDING COMPLIANCE

Manager does not assume and is given no responsibility for compliance of the Project or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owner promptly or forward to Owner promptly any complaints, warnings, notices or summons received by Manager relating to such matters. Owner authorizes Manager to disclose the Ownership of the Project(s) to any such officials and agrees to indemnify and hold Manager its representative, servants, and employees harmless of and from all loss, cost, expense and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes or regulations;.

13

**SECTION 18**

**TERMINATION**

18.1    <u>TERMINATION BY EITHER PARTY:</u>  This Agreement may be terminated by either Owner or Manager, with or without cause, anytime by giving not less than thirty (30) days advanced written notice to the other party.

18.2    <u>TERMINATION FOR CAUSE:</u>  Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to Section 18.3 as a result of such termination, and obligations to insure and indemnify), upon the occurrence of any of the following events:

A.    <u>Breach of Agreement:</u>  Ten (10) days after the receipt of notice by either party to the other specifying in detail a material breach of this Agreement, if such breach has not been cured within said ten (10) day period;  or if such breach is of a nature that it cannot be cured within said ten (10) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach has not commenced and/or such efforts are not proceeding and being continued diligently both during and after such ten (10) day period prior to the breach being cured.  However, the breach of any obligation of either party hereunder to pay any moneys to the other party under the terms of this Agreement shall be deemed to be curable within ten (10) days.  Termination of this Agreement shall be Owner's sole remedy for claims of breach of contract.

B.    <u>Excessive Damage:</u>  Upon the destruction of or substantial damage to the Project by any cause, or the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

C.    <u>Sale of Project:</u>  In the event of the sale of the Project, this Agreement shall terminate upon the giving of not less than thirty (30) days written notice by Owner to Manager, or transfer to new Owner with Manager's approval (if buyer closes).

D.    <u>Default:</u>  Each of the following events shall constitute an event of default by the party in respect of which such even occurs:

1.    the failure of either party to pay any amounts required to be paid by it hereunder or to perform any of its obligations hereunder for a period of ten (10) days after the date on which notice of the failure has been given to the defaulting party by the other party;

2.    the filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy or similar creditor relief law;

3.    the consent to an involuntary petition in bankruptcy or the failure by such party to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

4.    the entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or involvement or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days;

14

5.      the failure to fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement and the continuance of any such default for a period of ten (10) days after written notice of said failure; and

18.3    <u>TERMINATION COMPENSATION:</u>  Any amounts accruing to Manager prior to such termination shall be due and payable upon termination of this Agreement.  To the extent that funds are available, and in any event prior to the disbursement of payments on underlying mortgage obligations and payments to Owner, such sums shall be payable from the operating accounts.  Any amounts due in excess of the funds available from the operating account shall be paid by Owner to Manager upon demand.

18.4    <u>OWNER RESPONSIBLE FOR PAYMENTS:</u>  Upon termination of or withdrawal from this Agreement, Owner shall assume the obligations of any contract or outstanding bill executed by Manager under this Agreement for and on behalf of Owner, if such bill was incurred by Manager in accordance with the Plan or as otherwise approved by Owner.  In addition, Owner shall indemnify Manager against any obligations or liabilities which Manager may have properly incurred on Owner's behalf under this Agreement.

18.5    <u>ACCOUNTS:  UNPAID BILLS:</u> Manager shall deliver to Owner, within forty-five (45) days (or sooner if required by law) after this Agreement is terminated, any balance of moneys due Owner and tenant security deposits which were held by Manager with respect to the Project, as well as a final accounting reflecting the balance of income and expenses with respect to the Project, as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Project.  Bills previously incurred but not yet invoiced shall be the responsibility of and sent directly to Owner.

18.6    <u>FINAL ACCOUNTING:</u>  Since all records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other papers and documents which pertain to the Project are deemed to be the property of the Owner, they are to be constructively delivered to Owner by leaving same onsite, upon the effective date of such termination, after payment of all payroll and fees due Manager.  Manager may retain temporary possession of such records as may be necessary in order to comply with the provisions of Section 18.5 and/or state law.

18.7    <u>NON-INTERFERENCE WITH MANAGER'S BUSINESS:</u>  Owner agrees that during the term of this Agreement and for a period of twelve (12) months after termination of this Agreement, Owner will under no circumstances hire any of Manager's employees of special talent, or privy to Manager's confidential business information, or who have contributed notably to the good will of Manager's business or any broker, salesman or leasing agent to perform any services which are in the scope of Manager's business.  Owner further agrees to limit its contact with Manager's employees to those management personnel designated by Manager during the term of this Agreement.  In the event of an actual or threatened breach of this covenant by Owner, Manager shall be entitled to an injunction restraining Owner from committing, or continuing to commit, any such breach.  Nothing herein stated shall be construed as prohibiting Manager from pursuing any other remedies available to Manager for such breach and threatened breach, including recovery of damages from Owner.

## SECTION 19

## REPRESENTATIONS

19.1    <u>OWNER'S REPRESENTATIONS AND WARRANTIES:</u>  Owner represents and warrants as follows:  (a) Owner has the full power and authority to enter into this Agreement, and the person executing this Agreement is authorized to do so;  (b) there are no written or oral agreements affecting the Project other than the tenant leases or rental agreements, copies of

15

which have been furnished to Manager; (c) all permits for the operation of the Project has been secured and are current; and (d) Owner is not aware of any violation of any building or construction statute, ordinance, or regulation that will affect the operation of the Project; (e) if Owner requests Manager to enter any agreements for the benefit of third parties (ie. subordination agreement) Owner hereby agrees to fully indemnify Manager for all claims arising from such Agreements.

19.2    <u>MANAGER'S REPRESENTATIONS AND WARRANTIES:</u> Manager represents and warrants as follows: (a) the officers of Manager have the full power and authority to enter into this Agreement; (b) there are not written or oral agreements by Manager that will be breached by, or agreements in conflict with, Manager's performance under this Agreement; and (c) where necessary, Manager will be duly licensed and able to perform all of the duties under this Agreement at the effective date of this Agreement and shall comply with and abide by all laws, rules, regulations, and ordinances pertaining thereto.

## SECTION 20

## HEADINGS

All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

## SECTION 21

## FORCE MAJEURE

Any delays in the performance of any obligation of Manager under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, strikes, labor disputes, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Manager, and any time periods required for performance shall be extended accordingly.

## SECTION 22

## COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between Owner and Manager with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owner and Manager relating to the Project covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owner and Manager. Except as otherwise provided herein, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by Owner and Manager in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, entering into and executing this Agreement has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, or as set forth in an exhibit or appendix to this Agreement.

*Revised 12/09/14*

## SECTION 23

## RIGHTS CUMULATIVE: NO WAIVER

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

## SECTION 24

## APPLICABLE LAW AND LITIGATION

24.1     INTERPRETATION:     The execution, interpretation and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of the location of the Project. If any part of this Agreement shall be declared invalid or unenforceable, Manager shall have the option to terminate this Agreement by notice to Owner.

24.2     DISPUTE RESOLUTION. The Parties agree to first try to resolve any dispute or controversy arising out of, in connection with, or relating to this Agreement between them. If they are unable to do so, the Parties then agree to seek mediation before a mediator acceptable to each of the Parties. If mediation fails to resolve the dispute or controversy, the Parties agree to submit the dispute or controversy to binding arbitration conducted by an arbitrator mutually selected by the Parties, or, in the event the Parties cannot agree upon such an arbitrator, then by the American Arbitration Association (the "AAA"). The arbitration shall be conducted pursuant to the AAA's then-existing rules and regulations and shall be held in the state in which the Project is located, and, unless agreed to otherwise by both parties, in the parish where the Project is located. Any decision so rendered in arbitration shall be binding and final on all Parties.

## SECTION 25

## NOTICES

Any notices, demands, consents and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as Owner and Manager individually may specify hereafter in writing:

MANAGER:          Mr. Joseph Pappalardo, Sr., President
                  Latter & Blum Property Management, Inc.
                  5557 Canal Blvd
                  New Orleans, LA 70124
                  Email: jpapplardo@latterblumpm.com


WITH COPY TO:     Laura White
                  Latter & Blum Property Management, Inc.
                  10455 Jefferson Hwy, Ste. 100
                  Baton Rouge, LA  70809
                  Email: lwhite@latterblumpm.com

17

*Revised 12/09/14*

OWNER:      Carroll Properties One, LLC
PO Box 329
Clinton, WA  98236
austinzcarroll@gmail.com

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office.  Such notices, demands, consents and reports may also be delivered by hand or by any other receipted method or means permitted by law.  For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

## SECTION 26

## MISCELLANEOUS

26.1    <u>Compliance with Government Orders</u>.  The Manager will take such action as may be reasonably necessary to comply promptly with any and all governmental orders or other requirements affecting the Project, whether imposed by federal, state, parish, or municipal authority.  Nevertheless, the Manager shall take no such action so long as the Owner is contesting or has affirmed its intention to contest, any such order or requirement; provided however, that the Manager shall only be required to delay or refrain from performing pursuant to the foregoing so long as and to the extent that such delay will not lead to the Manager's civil or criminal liability.  The Manager will notify the Owner in writing of all notices of such orders or other requirements within seventy-two hours from the time of their receipt.  The Manager will notify the Owner when legal notices, including but not limited to employment discrimination claims, housing discrimination claims, other labor and employment claims, state and local code violations, and other matters affecting the Project and its operation are received by Manager.  The Owner shall be notified of the selection of legal counsel.

26.2    <u>Non-Discrimination</u>.  In the performance of any of its obligations under this Agreement, the Manager will comply with the provisions of any and all federal, state, or local laws prohibiting discrimination in housing and in employment.

26.3    <u>Inspections and Program Compliance Audits</u>.  The Manager will notify the Owner of any notices that it receives of reviews by HUD/HFA or any other regulatory authority.  The Manager is responsible for completing the response to any audits conducted by HUD/HFA or other compliance entity, and Owner is obligated to cooperate fully with Manager in connection with same.  The Manager will furnish Owner with copies of all reports and responses within a reasonable time of completion or receipt, as the case may be.  The Agent will correct and resolve property and compliance deficiencies and HUD-2530 notices resulting from its management of the Project.

26.4    Additional Definitions.  As used in this Agreement:

A.    "HFA"  means the local or state Housing Finance Agency or Contract Administrator with regulatory authority over the Project, if applicable;
B.    "LIHTC" means the federal Low Income Housing Tax Credit Program; and
C.    "HUD" means the U.S. Department of Housing and Urban Development.

18

SECTION 27.

AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

OWNER:

By: Carroll Properties One, LLC

By: _____

Printed Name:  Austin Carroll

Its: _____

Date:  8/24/18

MANAGER:

By:  LATTER & BLUM PROPERTY MANAGEMENT, INC.

By: _____

Printed Name:  Laura T. White

Its: _____

Date: _____

19

*Revised 12-09-14*

State of
Louisiana
Secretary of
State

**COMMERCIAL DIVISION**
**225.925.4704**

Fax Numbers
225.932.5317 (Admin. Services)
225.932.5314 (Corporations)
225.932.5318 (UCC)



---

| Name | Type | | City | Status |
|------|------|--|------|--------|
| CARROLL PROPERTIES ONE LLC | Limited Liability Company (Non-Louisiana) | | CLINTON | Inactive |

**Previous Names**

| | |
|--|--|
| **Business:** | CARROLL PROPERTIES ONE LLC |
| **Charter Number:** | 42379680Q |
| **Registration Date:** | 9/2/2016 |

**Domicile Address**
7374 MAXWELTON ROAD
CLINTON, WA 98236

**Mailing Address**
7374 MAXWELTON ROAD
CLINTON, WA 98236

**Principal Business Office**
7374 MAXWELTON ROAD
CLINTON, WA 98236

**Registered Office in Louisiana**
11616 SOUTHFORK AVENUE
SUITE 302
BATON ROUGE, LA 70816

**Principal Business Establishment in Louisiana**
11440 BARD AVENUE
BATON ROUGE, LA 70815

## Status

| | |
|--|--|
| **Status:** | **Inactive** |
| **Inactive Reason:** | **Action By Secretary of State** |
| **Qualified:** | 9/2/2016 |
| **Last Report Filed:** | 8/4/2020 |
| **Type:** | Limited Liability Company (Non-Louisiana) |

## Registered Agent(s)

| | |
|--|--|
| **Agent:** | THOMAS D. FAZIO |
| **Address 1:** | 11616 SOUTHFORK AVENUE |
| **Address 2:** | SUITE 302 |
| **City, State, Zip:** | BATON ROUGE, LA 70816 |
| **Appointment** | 9/2/2016 |



EXHIBIT

| | |
|---|---|
| **Date:** | |
| **Agent:** | W L WEST |
| **Address 1:** | 8440 JEFFERSON HWY |
| **Address 2:** | SUITE 301 |
| **City, State, Zip:** | BATON ROUGE, LA 70809 |
| **Appointment Date:** | 8/12/2019 |

# Officer(s)

**Additional Officers: No**

| | |
|---|---|
| **Officer:** | AZCO CAPITAL LLC |
| **Title:** | Member |
| **Address 1:** | 7374 MAXWELTON ROAD |
| **City, State, Zip:** | CLINTON, WA 98236 |

| | |
|---|---|
| **Officer:** | AUSTIN CARROLL |
| **Title:** | Member |
| **Address 1:** | 7374 MAXWELTON ROAD |
| **City, State, Zip:** | CLINTON, WA 98236 |

| | |
|---|---|
| **Officer:** | CEBARN CARROLL |
| **Title:** | Member |
| **Address 1:** | 7374 MAXWELTON ROAD |
| **City, State, Zip:** | CLINTON, WA 98236 |

| | |
|---|---|
| **Officer:** | CARROLL PROPERTIES, LP |
| **Title:** | Member |
| **Address 1:** | 7374 MAXWELTON ROAD |
| **City, State, Zip:** | CLINTON, WA 98236 |

## Amendments on File (3)

| Description | Date |
|---|---|
| Revoked | 1/9/2018 |
| Reinstatement | 4/3/2019 |
| Revoked | 12/15/2021 |

Print